UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Maria Malark,                                    File No. 18-cv-3179 (ECT/TNL)

       Plaintiff,

v.

                                **OPINION AND ORDER**

RBC Capital Markets, LLC
d/b/a RBC Wealth Management,

       Defendant.
_____

James H. Kaster, Laura Farley, and Michelle L. Kornblit, Nichols Kaster, PLLP, Minneapolis, MN, for Plaintiff Maria Malark.

Melissa Raphan, Marilyn J. Clark, Andrew T. James, and Trevor C. Brown, Dorsey & Whitney LLP, Minneapolis, MN, for Defendant RBC Capital Markets, LLC d/b/a RBC Wealth Management.
_____

Plaintiff Maria Malark alleges that Defendant RBC Wealth Management violated federal and Minnesota state laws forbidding discrimination on the basis of sex and other characteristics when, in October 2017, it terminated her employment as RBC's Director of Operations for U.S. Wealth Management. RBC has moved for summary judgment, and its motion will be granted in part. A jury reasonably could determine that RBC discriminated against Malark on the basis of sex in violation of Title VII and the Minnesota Human Rights Act ("MHRA"). Malark has failed, however, to identify record evidence from which a jury might find in her favor with respect to essential elements of her claims under the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and for other forms of discrimination under Title VII and the MHRA.

I

A

Malark began working for RBC in 2000, when RBC acquired her then-employer, Dain Bosworth. Malark Decl. ¶ 2 [ECF No. 190]. Malark received full credit for her tenure at Dain Bosworth and, in 2005, RBC promoted Malark to Director of Operations for U.S. Wealth Management. *Id.* ¶¶ 2–3. In that role, Malark "was responsible for delivering operations services to RBC's business lines in accordance with the firm's strategic priorities and regulatory policies" and oversaw approximately 350 employees. *Id.* ¶¶ 4–5. In 2010, Malark began reporting to Ingrid Versnel, RBC's Global Head of Wealth Management Operations and Technology, who was based in Toronto. Versnel Decl. ¶¶ 1–3 [ECF No. 165]; Second Kornblit Decl., Ex. 1 at 19:1–20, 27:22–23, 45:13–15 ("Versnel Dep.") [ECF No. 191-1] and Ex. 3 at 39:8–11 ("Malark Dep.") [ECF No. 191-2]. Malark also had a local supervisor—from 2010–2016, her local supervisor was John Taft; from 2016–2017, Kristin Kimmel; and from 2017 until her termination, Brett Thorne. Malark Dep. at 40:4–15.

According to Versnel, Malark "had a strong performance history" and "generally performed well against the measurable performance objectives," all of which was reflected in her "positive performance reviews." Versnel Dep. at 24:24; Versnel Decl. ¶ 4; *see* Second Kornblit Decl., Exs. 9, 11–16 [ECF Nos. 191-7, 191-9–191-14]. Versnel typically completed mid-year and year-end performance evaluations of Malark, with the evaluation year ending in October. *See* Versnel Dep. at 45:16–19, 80:21–25. The format of the evaluations allowed for performance ratings in specific categories (including things like

strategy, leadership, and collaboration), an overall performance rating, and comments. *See* Second Kornblit Decl., Exs. 9, 11–16. Throughout the time she was supervised by Versnel, Malark received only "High Performance" or "Outstanding" ratings, both in individual categories and overall, which were the third and second highest of five possible ratings. *Id.*; *see* Versnel Dep. at 47:19–48:17.[1] During her deposition, Versnel testified that a rating of high performance was equivalent to "average" or "meets expectations." Versnel Dep. at 48:13–25. Malark also received an annual bonus. *Id.* at 113:8–17. Versnel further testified that Malark was never given a formal written or verbal warning or put on a formal performance improvement plan during the time she supervised Malark. *Id.* at 111:11–112:7; *see* Second Kornblit Decl., Ex. 5 at 49:4–22, 54:5–55:5 ("Sorenson Dep.") [ECF No. 195]

Even so, Malark and RBC's human resources department received negative feedback from Malark's direct reports, RBC employees, and RBC business partners concerning her behavior and interactions with them. Versnel Decl. ¶¶ 4–5; First Kornblit Decl., Ex. 4 at 7–8 [ECF No. 125-2]. As a result, Versnel decided it would be helpful for Malark to work with an executive coach, Karen Lanson. Versnel Decl. ¶¶ 5–6; Versnel Dep. at 61:15–17. Three of Versnel's male direct reports also received executive coaching at various times. Versnel Dep. at 60:16–61:7. Malark began working with Lanson in 2013, focusing on a list of "development needs" prepared by a senior human resources employee, Joe Gasik, as well as on the improvement of her relationship with Versnel. Versnel

---

[1] It is uncertain whether Versnel completed her written mid-year and year-end assessments of Malark in 2014. *See* Second Kornblit Decl., Exs. 11, 12; Versnel Dep. at 77:4–81:1–10.

Decl. ¶ 6–7, Ex. A [ECF No. 165-1].  Lanson provided Versnel, Gasik, and Lisa Sorenson,

the Director of Human Resources for RBC U.S. Wealth Management, with updates on

Malark's progress.  *Id.* ¶¶ 5, 8; First Clark Decl., Exs. 1, 5 [ECF Nos. 167-1, 167-5].  Malark

showed improvement on her coaching objectives but also continued to receive negative

feedback.  *See* Versnel Decl. ¶ 8; First Clark Decl., Exs. 2–4, 6–9 [ECF Nos. 167-2–167-

4, 167-6–167-9]; Second Kornblit Decl., Exs. 7 [ECF No. 191-5], 9, 10 [ECF No. 191-8];

Versnel Dep. at 63:3–9, 81:11–19; Sorenson Dep. at 67:13–71:12.  Malark continued to

receive coaching from Lanson until the spring of 2015.  Versnel Decl. ¶ 8; *see* First Clark

Decl., Ex. 10 [ECF No. 167-10]; Versnel Dep. at 62:24–63:2.

    In May 2015, results from an employee opinion survey showed that Malark made

"significant" gains from 2014 in every measured category.  Second Kornblit Decl., Ex. 17

[ECF No. 197].  Versnel testified that the survey is conducted annually and "used to

understand and take a measurement of the sentiment of the employees across the

organization" and that although it "includes some questions about an employee's manager,

it is *not* a targeted evaluation of the individual manager."  Versnel Dep. at 91:2–5; Versnel

Suppl. Decl. ¶¶ 6–7 [ECF No. 248].  Malark also received an overall performance rating

of "Outstanding" from Versnel at year-end in 2015.  Second Kornblit Decl., Ex. 14.

Despite continuing concerns about Malark, Versnel Decl. ¶ 8, in 2016, Versnel increased

both Malark's responsibilities and the number of employees under her management,

Malark Decl. ¶ 5; Versnel Dep. at 96:22–97:17.  Versnel subsequently gave Malark overall

performance ratings of "High Performance" at mid-year in 2016 and "Outstanding" at year-

end in 2016.  Second Kornblit Decl., Ex. 15.  In her overall comments, Versnel wrote,

4

among other things, that "[f]eedback from business partners, functional partners and colleagues in other business groups on Maria's contribution is inconsistent with respect to her partnering and collaboration. Some groups are receiving the benefit of Maria's extensive knowledge, expertise and problem solving skills. Other groups find this to be an area for improvement." *Id.* Versnel noted that "capacity constraints" could be a contributing factor. *Id.* At mid-year in 2017, Versnel gave Malark an overall rating of "High Performance" but did not complete the rest of the evaluation. *Id.*, Ex. 16; Versnel Dep. at 140:5–25. The results of an employee opinion survey conducted in spring 2017 showed year-over-year improvement by Malark in a majority of the measured categories. Second Kornblit Decl., Exs. 22, 23 [ECF No. 199, 201]. In 2016 and 2017, Malark ranked in the "second cohort," or quartile, on RBC's ranking of manager effectiveness, as compared to other managers, which was based on information from employee opinion surveys. *Id.*, Exs. 18, 19, 24 [ECF Nos. 191-15–191-16, 191-19]; Versnel Dep. at 97:24–98:10. A "9 Box Assessment," viewed by Malark in April 2017, showed her positioning within RBC as it related to her "performance and potential" as an "Expert," someone with "high performance and low potential." Malark Decl. ¶ 9; *see* Second Kornblit Decl., Ex. 21 [ECF No. 191-18]. The "9 Box Assessment" is a tool RBC uses to provide feedback to an individual "related to their performance and potential in their current role" as part of "talent succession planning." Sorenson Dep. at 86:7–89:16. Versnel did not provide any input on Malark's 2017 "9 Box" rating. Versnel Suppl. Decl. ¶ 9.

B

Malark was one of four female directors who reported directly to Versnel.  Malark Decl. ¶ 8.  Around 2015, one of those directors, Lisa Norton, transferred to a different department, and another, Catherine Patterson, retired.  Versnel Dep. at 57:18–22.  Versnel testified in her deposition that, between January 2014 and the time of her deposition, two of her male direct reports left RBC involuntarily, one transferred to another role and eventually left RBC, and two others were reassigned to report to other managers.  *Id.* at 52:3– 56:19.

During her deposition, Malark recalled that Norton shared concerns with her about "being successful as a woman working for [Versnel]" and that Patterson had told her that Versnel scrutinized Patterson's deliverables.  Malark Dep. at 22:5–26:20.  Malark also testified that two male directors shared concerns with her about reduction of their roles and career advancement under Versnel.  *Id.*  Malark testified that she brought concerns to Sorenson on numerous occasions between 2015 and 2017 that Versnel was treating female directors poorly and showed a preference for male directors.  *Id.* at 14:4–18:10; 26:21– 29:1, 30:6–16, 31:9–11.  For example, Malark testified it was her experience that Versnel assigned more stringent deliverables and tighter deadlines to female directors than male directors.  *See id.* at 15:17–14, 22:5–7, 114:7–10.  During her deposition, Sorenson did not recall Malark raising concerns "about working with [Versnel] as a woman at RBC" or that Malark's concerns about other employees or her own success working for Versnel were "gender related."  Sorenson Dep. at 42:8–45:20.

According to Malark, by mid-2017, she was the only female director reporting to Versnel.  Malark Decl. ¶ 8.  However, Versnel provided conflicting deposition testimony as to whether another female director, Irina Brinza, was reassigned to report to a male peer in June or July of 2017 or at the end of 2017.  Versnel Dep. at 52:15–23, 56:20–57:3, 57:8–58:20, 121:1–10.  During her deposition, Malark testified that she "felt as if [Versnel] was slowly going through the ranks of her women that worked for her and somehow getting them to move on or move out."  Malark Dep. at 72:20–22.  Malark "felt like that was starting to happen to [her]" as well.  *Id.* at 72:13–73:14, 297:25–298:1.  In an August 4, 2017 email, Malark complained to Thorne about Versnel's micro-managing and that Versnel's actions were "making the work environment unacceptable."  Second Kornblit Decl., Ex. 32 [ECF No. 207].  Thorne forwarded this email to Sorenson, adding that he wanted Sorenson "to see it in light of our discussions."  *See* Sorenson Dep. at 126:18–127:20.  Malark also expressed concerns to Sorenson that Versnel was increasingly scrutinizing her work and putting "new demands" on her.  Malark Dep. at 83:11–16, 85:5–13; *see* Sorenson Dep. at 99:15–100:21.  As of the end of 2017, there were no women reporting directly to Versnel, though one female director began reporting to Versnel at the end of 2018.  Versnel Dep. at 58:18–20, 59:6–60:15.

C

During the spring of 2017, with direction from the Boston Consulting Group, RBC undertook a "Cultural Transformation" initiative that involved the adoption of a new "Leadership Model."  Versnel Decl. ¶ 9.  Versnel testified in her deposition that the intent of the initiative was "to look at RBC as an organization and determine whether or not the

7

way that we operated within the company and used the desired leadership behaviors was sufficient to make us successful on a long-term basis in the future."  Versnel Dep. at 115:17–21.  Under the model, RBC employees in leadership positions would be assessed on "how they approached and interacted with their teams and business partners in completing their work," not simply on their performance results.  Versnel Decl. ¶ 9; *see* First Clark Decl., Exs. 17–19 [ECF Nos. 167-17, 168, 169].  The original timeline for the initiative provided that any changes in employment status as a result of the transformation would be communicated to employees on June 14 and 15, 2017.  First Clark Decl., Ex. 17 [ECF No. 167-17 at 12].

In May 2017, Versnel advised Malark that U.S. Wealth Management Operations would be part of the initiative.  Versnel Decl. ¶ 10.  According to Sorenson, Malark "struggled" with organizational change, but she could not recall any specific concerns Malark had with the cultural transformation.  Sorenson Dep. at 92:20–98:25.  Malark and others were asked to prepare and present organizational restructuring proposals.  *See* First Clark Decl., Ex. 23 [ECF No. 167-23]; Malark Dep. at 119:19–120:9 (stating she was "cautious" about "designing and presenting an organizational structure").  On June 1, 2017, Versnel emailed Malark to thank her for her efforts and wrote that Malark had "made a great start" and was "definitely living up to the leadership model."  Second Kornblit Decl., Ex. 29 [ECF No. 191-22].  In her deposition, Versnel testified that her email was an acknowledgement that Malark "finally delivered" her work "[a]fter a long struggle to get Maria to participate and deliver against the expectations of the cultural transformation program."  Versnel Dep. at 134:13–135:15.  Katherine Kliszcz, an HR representative in

RBC's Toronto office, also emailed Malark that Versnel was "very pleased" and "very impressed" with Malark's work and "encouraged by [Malark's] long term view." *Id.*, Ex. 28 [ECF No. 191-21].

D

In early 2017, Malark's then-teenage daughter began experiencing serious health issues, including anxiety and depression, and was suicidal. Malark Dep. at 159:19–20 [ECF No. 194]. In April and May, Malark began to miss work to care for her daughter. *Id.* at 148:10–13. On June 5, Malark emailed Versnel and Thorne that she would need to take some time away from the office "over the next couple of weeks" because her daughter had been admitted to an inpatient mental health unit. First Kornblit Decl., Ex. 5 [ECF No. 125-3]. Versnel responded that Malark should "take the time to take [care] of [her] family and [he]rself." *Id.* Thorne also told Malark to "[b]e there for [her] daughter" and offered to assist her if needed. Second Clark Decl., Ex. 3 [ECF No. 183]. Versnel later testified that she understood it to be a "serious situation" and that Malark "anticipated the need to have time off" but that "[d]etails were not provided." Versnel Dep. at 35:25–36:4, 138:25–139:2, 179:11–15.

In late summer 2017, Malark notified Sorenson that she was having personal issues with her daughter and needing to be in and out of the office. Sorenson Dep. at 101:5–102:8. On August 14, Malark emailed Thorne to let him know she would be "on and off-line" the next day as her daughter "took a major step back." First Kornblit Decl., Ex. 7 [ECF No. 132]. Thorne responded, "No worries. Good luck with your daughter. I hope things improve." *Id.* On September 6, Malark emailed Versnel to let her know that she

9

was at the hospital with her daughter and would be out for the morning.  *Id.*, Ex. 8 [ECF No. 134].  Versnel responded, "No worries about meetings etc.  Take care of your family and yourself[,]" and offered support.  *Id.*  Versnel also forwarded Malark's email to Sorenson, writing that she was "concerned for [Malark]" as Malark had not "shared anything further" and "the health issues with her daughter are continuing."  *Id.*, Ex. 9 [ECF No. 136].  Sorenson and Versnel discussed Malark's situation further, and Sorenson informed Versnel that "from a U.S. law perspective that we have an obligation to provide her notice through our FMLA group."  Sorenson Dep. at 102:18–104:20.  In her personal notes dated September 7, Versnel wrote, "MM – there is a requirement to notify FMLA."  Versnel Decl., Ex. D [ECF No. 165-4 at 12].

On September 15, Sorenson emailed Jessica Hawley, RBC's Manager of Accommodations and Leaves of Absence, and requested that she forward FMLA paperwork to Malark.  First Kornblit Decl., Ex. 10 [ECF No. 138].  Three days later, Hawley emailed Malark to discuss whether she might need a leave of absence.  *Id.*, Ex. 12 [ECF No. 142].  Malark then called Hawley to discuss her daughter's situation and FMLA leave.  Second Kornblit Decl. Ex. 36 at 49:7–51:16 ("Hawley Dep.") [ECF No. 191-25]; *see* First Kornblit Decl., Ex. 13 [ECF No. 144].  Hawley explained, among other things, that "in order to be counted, so to speak, as an FMLA day," Malark would need to be "a hundred percent out of the office" and reportedly stated, "And, Maria, when does that ever happen?  When has that ever happened?"  Malark Dep. at 70:13–71:17.  During the call, Malark expressed that she was "[c]oncerned about potential retaliation from [Versnel]" if she were to take time off.  Hawley Dep. at 71:6–13; Malark Decl. ¶ 13.

10

After the call, Hawley sent Malark a form email with additional information about FMLA.  Hawley began the email by stating, "On September 18, 2017, I was notified of your request for Intermittent Family and Medical Leave Act (FMLA)."  First Kornblit Decl., Ex. 14 [ECF No. 146].  Several documents were attached to the email, including a Notice of Eligibility, which stated that Malark was eligible for FMLA leave for the leave year of 9/18/17 to 9/17/18, a Certification of Health Care Provider form to be completed by her daughter's physician and returned within 15 calendar days of Malark's first day missed, and an Intermittent Leave Guide.  *See id.*, Exs. 15–18 [ECF Nos. 148, 150, 152, and 154].  Hawley also emailed Versnel to notify her that Malark had "requested an intermittent [FMLA] leave of absence."  *Id.*, Ex. 19 [ECF No. 156].  However, Malark never submitted any FMLA paperwork.  Malark Dep. at 68:14–16.  On October 6, Hawley emailed Josette Kauffeld, an HR manager, to follow up about Malark's need for FMLA leave.  Hawley Dep. at 17:1–18:10.  Kauffeld informed Hawley that she didn't need to follow up with Malark because Malark was going to be terminated.  *See id.* at 19:13–16; First Kornblit Decl., Ex. 13.

E

The timing of the decision to terminate Malark's employment with RBC is somewhat unclear.  During her deposition, Versnel first testified that she made the decision to remove Malark from her position "by late May of 2017" after assessing "whether or not [Malark] represented [the] skills and capabilities" emphasized in RBC's cultural transformation and that she discussed the decision with her supervisor, Doug Guzman, at that time.  Versnel Dep. at 20:20–21:2, 21:17–22:9; 22:23–23:9, 25:22–26:5; 28:1–3; *see*

11

Versnel Decl. ¶¶ 12–13; Guzman Decl. ¶ 4–5 [ECF No. 246].  Versnel also testified that she told Thorne of her decision at that time, but Thorne could not recall specifically when he became aware of Versnel's intention to remove Malark from her role.  Versnel Dep. at 114:4–20; Thorne Decl. ¶ 7 [ECF No. 164]; First Clark Decl., Ex. 26 at 19:16–22:16 ("Thorne Dep.") [ECF No. 173].  Versnel further testified that, in her assessment, Malark had "[d]ifficult relationships with colleagues, peers, [and] staff members, didn't demonstrate strategic thinking about potential for improvement in the environment for the future, demonstrated reactive planning as opposed to proactive strategic formulation, [and] demonstrated resistance to change."  Versnel Dep. at 43:2–7.  Versnel's personal notes dated May 5, 2017, refer to an "MM succession plan," but Versnel testified that there was not, to her knowledge, any documentation of her assessment of Malark or her decision. Versnel Decl., Ex. B [ECF No. 165-2 at 2]; Versnel Dep. at 21:3–9, 23:10–20; 28:4–7. Versnel testified that "[s]uccession planning is a continuous process" and that "[g]enerally the responsibility of the manager is to have succession plans in place for key positions within the team," and agreed that "the idea of having a succession plan in place does not mean that the person's performance is somehow wanton."  Versnel Dep. at 74:6–11, 74:17– 20, 126:14–21; *see* Sorenson Dep. at 82:9–10 ("Succession planning was a general part of talent at RBC.").  Versnel's personal notes from May 19 indicate that she planned to meet with Malark to "provide honest feedback," "acknowledge [her] contribution and effort," and tell Malark that she "need[ed] to examine future capabilities for success and indicators are gaps may be too big to address in time needed."  Versnel Decl., Ex. B.  Versnel's personal notes from June 2 refer to "Brett [Thorne] and Lisa [Sorenson] re U.S. operating

replacement." *Id.* However, Versnel testified that there was "no specific document that [she] recall[ed]" to "suggest that a decision to terminate [Malark] was made before June 5th," the date Malark first informed Versnel and Thorne of her daughter's health issues. Versnel Dep. at 36:10–13.

As of May 2017, "it was a possibility" that Malark could be placed in an alternate role within RBC. *Id.* at 26:6–8. Versnel testified that, at some point, she "discuss[ed] the possibility of exploring other opportunities" with RBC's human resources personnel, specifically Sorenson. *Id.* at 26:9–14, 30:22–31:5, 33:19–35:10. According to Versnel, Sorenson reported "likely in June or July" that human resources had not identified any alternate positions that would be appropriate for Malark. *Id.* at 49:25–50:8, 51:10–19; Versnel Decl. ¶ 15. But Sorenson testified in her deposition that, to her knowledge, Malark was not considered for any other positions at RBC and she did not recall anyone asking her to look into alternative positions. Sorenson Dep. at 37:11–38:15. Sorenson did recall, however, that "the conversation was that there wasn't a senior enough role to put [Malark] into." Sorenson Dep. at 116:15–118:10. Thorne also recalled a conversation about the possibility of Malark moving to a new role and that his position was that it would be "too disruptive." Thorne Dep. at 19:16–21:8. Versnel scheduled several meetings in July and August concerning a "development plan" for Malark and testified at her deposition that a development plan would indicate Malark was staying with RBC. *See* Second Kornblit Decl., Exs. 53–55 [ECF Nos. 191-36–38]; Versnel Dep. at 146:13–18. However, Versnel also testified that she may have used the descriptor of a "development plan" in order to "protect the privacy and the confidentiality of the subject matter" rather than referring to

13

an "exit plan or succession plan."  Versnel Dep. at 145:19–146:8.  Versnel provided conflicting testimony as to when she decided to terminate Malark's employment with RBC, stating at various points that she made the decision in June, July, or August of 2017.  *Id.* at 51:10–19, 149:4–23; Versnel Decl. ¶ 15.

During July and August of 2017, Versnel consulted Thorne and two senior executives, Michael Armstrong and Tom Sagissor, about Malark, each of whom supported the decision to terminate her employment.  Versnel Decl. ¶ 18, Ex. D; Thorne Decl. ¶¶ 6–7.  Versnel's personal notes dated August 9 include the entry "Maria M. decision" with no further explanation.  Versnel Decl., Ex. D.  Also during that time, human resources employees prepared a list of candidates to take over Malark's position; interviews were conducted, and Versnel ultimately selected Greg Schwab, RBC's Managing Director of Global Technology Infrastructure.  *Id.* ¶ 20, Ex. D; First Clark Decl., Ex. 13 [ECF No. 167-13]; Second Kornblit Decl., Ex. 57 [ECF No. 191-40]; Versnel Dep. at 165:4–6.  According to Sorenson, Schwab had been suggested as a replacement by both Armstrong and Sagissor.  Sorenson Dep. at 112:10–17.  Armstrong reportedly thought Schwab "would be a great candidate for the operations role given his late-night career conversations" and that "he was a religious man" and Sagissor and Schwab "had a personal relationship."  *Id.* at 113:6–114:3.  Schwab "did not have an extensive operations background," but Versnel selected him "based on his strong leadership history with RBC."  Versnel Decl. ¶ 20; *see* Versnel Dep. at 41:11–16; Second Kornblit Decl., Ex. 48 [ECF No. 224] (email from Schwab stating "[w]hile I don't know anything about Ops(lol) I know how to engage team members."); *see generally* Second Kornblit Decl., Ex. 45 ("Schwab Dep.") [ECF No. 191-

14

31].  Schwab is also a father, but the record does not reflect whether anyone other than Malark was aware of this fact.  *See* Malark Decl. ¶ 16.

"[S]ometime prior to September of 2017," before offering the position to Schwab, Versnel, Armstrong, and Sagissor spoke with Sorenson.  Sorenson Dep. at 27:17–37:9, 206–07; *see id.* at 144–48; Versnel Decl. ¶ 17.  Sorenson supported the decision to terminate Malark but raised potential risks: that given Malark's "performance history . . . it was a risk to terminate her and hire a man that was over 40 into that role," that "Schwab did not have operations experience at RBC," and that the exit of another senior female employee might not reflect well on RBC.  *Id.* at 29:8–11, 33:1–2, 145:10–15; Versnel Dep. at 155:18–24; *see* Second Kornblit Decl., Ex. 60 ¶ 6 [ECF No. 230].  In her deposition, Sorenson testified that she noted Malark's "performance in the written documentation overall was good" and that "some behavioral components of her performance . . . were not included in the performance reviews."  Sorenson Dep. at 31:8–9, 32:5–9.  According to Versnel, the concern about senior female employees leaving "was raised around the U.S. wealth management business under Michael Armstrong," not in the context of her group.  Versnel Dep. at 156:4–9; *see* Sorenson Dep. at 145:16–146:9 (testifying the female leaders at issue were supervised by Armstrong and Sagissor).  Sorenson testified that female senior leaders had previously left RBC because they "were treated differently" and "didn't look the same as the candidates that senior executives wanted to put in the positions," but that she "did not believe that was the case with [Malark]. . . because [she] understood the performance issues that were in place[.]"  Sorenson Dep. at 147:16– 148:12.

Though Versnel testified it was her decision to terminate Malark, it was Sorenson's understanding, despite not being involved in the "ultimate conversation," that "it was a combination of [Versnel] with Michael Armstrong and Tom Sagissor that made the decision." *Id.* at 27:7–13, 35:2–17, 119:17–121:18. Human resources created a communications plan for Malark's termination on approximately September 12, 2017, and a revised plan soon after. Second Kornblit Decl., Exs. 59, 61 [ECF Nos. 228, 232]. According to the revised plan, a "consensus" was reached regarding "the decision to exit [Malark] and move forward with Greg Schwab" on September 25, 2017. *Id.*, Ex. 61. Schwab accepted the position on September 29. *Id.*

The initial plan provided that Malark would be notified of her termination on October 17, but a revised timeline provided for earlier notification. *Id.*, Exs. 59, 61. On October 5, 2017, Versnel flew from Toronto to Minneapolis for the purpose of terminating Malark's employment. Versnel Dep. at 162:8–14. Malark was out of the office that day because her daughter had been taken by ambulance to the hospital. First Kornblit Decl., Ex. 20 [ECF No. 158]. At approximately 11:30 a.m., Malark emailed Thorne to let him know that she would not be able to attend a scheduled meeting because she was "working on a serious home issue." Second Kornblit Decl., Ex. 42 [ECF No. 191-29]. An hour later, Versnel emailed Malark, requesting that she call her. First Kornblit Decl., Ex. 20. When Malark called Versnel to explain the situation, Versnel told Malark that she and Thorne needed to meet with Malark in person as soon as possible and requested that Malark call back within the hour. *See* Second Kornblit Decl., Exs. 43, 44 [ECF Nos. 191-30, 220]. At approximately 2:20 p.m., Malark emailed Versnel that she was available for a call. First

Kornblit Decl., Ex. 20.  Versnel, along with Sorenson and Thorne, then called Malark and terminated her employment.  Malark inquired as to the reason for her termination and Versnel responded that Malark's "skills and capabilities were not sufficient to manage the group going forward with respect to leadership model behaviors, capacity to strategically design a future for the group, [and] to manage change."  Versnel Dep. at 166:8–167:3; Malark Dep. at 300:19–25.  Versnel denied that the termination was related to Malark's need to care for her daughter.  Versnel Dep. at 167:9–12.

In preparation for notifying RBC Wealth Operations managers and staff of Malark's termination, a "communications plan" was developed.  One of the anticipated questions addressed by the plan was, "How will [Schwab] be able to address Operations issues given that he does not come from an Operations background?"  Second Kornblit Decl., Ex. 47 [ECF No. 222].  On October 6, RBC issued a written announcement that Malark would be leaving RBC and that Schwab would be replacing her.  First Kornblit Decl., Ex. 2 [ECF No. 126].  The announcement stated that Malark's "down-to-earth style made her an authentic leader" and that she had been "a key contributor to the success of [RBC]."  *Id.* Malark continued to work until October 31 to assist in the management transition.  *Id.*; *see* Second Kornblit Decl., Ex. 49 [ECF No. 191-33].  Malark was the only person terminated from Versnel's direct reporting group as part of RBC's cultural transformation.  Versnel Dep. at 178:14–20.

On November 14, 2018, Malark commenced this lawsuit.  In her complaint,[2] Malark alleges that RBC terminated her employment because she sought and attempted to exercise family medical leave to care for her daughter's serious mental illness and associated symptoms.  Compl. ¶¶ 34–55, 61–72 [ECF No. 1].  Malark also alleges that RBC "maintained a pattern and practice of discriminating against women" and unlawfully discriminated against her as both a woman and a mother.  *Id.* ¶¶ 73–85, 93–109.  She further alleges that RBC "denied equal benefits and opportunity" to her and retaliated against her based on her daughter's disability.  *Id.* ¶¶ 86–92, 110–14.

## II

## A

Malark asserts both an "entitlement claim" and a "discrimination claim" against RBC under § 2615(a) of the FMLA.  Pl. Mem. in Opp'n at 43 [ECF No. 188].  Section 2615(a) reads:

### (a) Interference with rights

#### (1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

#### (2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual

---

[2]     Malark asserts nine claims: (I) Interference with Protected Leave in violation of the FMLA; (II) Retaliation in violation of the FMLA; (III) Sex Discrimination in violation of Title VII of the Civil Rights Act; (IV) Sex-Plus Discrimination in violation of Title VII of the Civil Rights Act; (V) Discrimination in violation of the ADA; (VI) Sex Discrimination in violation of the MHRA; (VII) Sex-Plus Discrimination in violation of the MHRA; (VIII) Familial Status Discrimination in violation of the MHRA; and (IX) Reprisal in violation of the MHRA.  Compl. ¶¶ 61–114.

> for opposing any practice made unlawful by this
> subchapter.

29 U.S.C. § 2615(a). Our Eighth Circuit Court of Appeals "has recognized three types of claims arising under these two subsections. The first type, arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.* Though the Eighth Circuit previously has described this type of claim as one for "interference" with FMLA rights, *e.g.*, *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006), it more recently declared that "what we formerly described as 'interference' claims henceforth shall be called 'entitlement' claims." *Bosley v. Cargill Meat Solutions Corp.*, 705 F.3d 777, 780 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005). The second type of claim is one for "retaliation." *Pulczinski*, 691 F.3d at 1005–06. A retaliation claim arises under § 2615(a)(2) and occurs when an employee opposes any practice made unlawful under the FMLA. *Id.* The third type of claim is one for "discrimination." *Id.* at 1006. A discrimination claim "arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Id.*; *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157–58 n.5 (8th Cir. 2016) (noting "unresolved difference of opinion" in the Eighth Circuit as to whether a discrimination claim arises under § 2615(a)(1) or (a)(2)). "In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is

alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment." *Pulczinski*, 691 F.3d at 1006. "An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Id.*

1

An employee who brings an entitlement claim under the FMLA "claims the denial of a benefit to which he [or she] is entitled under statute." *Bosley,* 705 F.3d at 780 (quoting *Pulczinski*, 691 F.3d at 1005). An employee must show not only that she is eligible for FMLA coverage, but also that she "gave [her] employer adequate and timely notice of [her] need for leave." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1116 (8th Cir. 2012) (quoting *Rynders v. Williams*, 650 F.3d 1188, 1196 (8th Cir. 2011)). Malark seeks partial summary judgment on the notice element; she argues that a reasonable juror could find only that she gave RBC notice of her need for FMLA leave. Pl. Mem. in Supp. at 16–19, 21 [ECF No. 123]; Pl. Mem. in Opp'n at 43. RBC does not dispute that Malark was eligible for FMLA coverage; RBC argues that fact disputes preclude the entry of summary judgment in Malark's favor with respect to the notice element and, regardless, that no reasonable juror could find that RBC denied Malark any benefit to which she was entitled under the FMLA. Def. Mem. in Supp. at 27–28 [ECF No. 162].

Start with the notice question. FMLA regulations regarding notice require an employee to "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c) (describing notice requirements for foreseeable FMLA

20

leave); *see also id.* § 825.303(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request.") (describing notice requirement for unforeseeable FMLA leave).   "Depending on the situation, such information may include . . . whether the employee or the employee's family member is under the continuing care of a health care provider . . . [or] if the leave is for a family member, that the condition renders the family member unable to perform daily activities[.]" *Id.* §§ 825.302(c), 825.303(b).  The regulations also provide that "[w]hen an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.*  "An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. §§ 825.302(d), 825.303(c).

Eighth Circuit cases articulate essentially the same rules as these regulations.  To satisfy the notice requirement, "an employee must provide [her] employer with enough information to show that [she] may need FMLA leave." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005); *see also Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 900 (8th Cir. 2010) ("Before an employee can claim FMLA protection, . . . the employee must put the statute in play[.] (citing *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 787 (8th Cir. 2009))).  Employees "have an affirmative duty to indicate both the need and the reason for the leave, and must let employers know when they anticipate returning to their position[s]." *Woods*, 409 F.3d at 990–91 (quotation omitted); *see also Bosley*, 705 F.3d at 780–81 (categorizing this as a "rigorous notice standard").  "An employee need not

invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000). "The adequacy of an employee's notice requires consideration of the totality of the circumstances, *e.g.*, *Scobey*, 580 F.3d at 787, and is typically a jury question, *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008)." *Murphy*, 618 F.3d at 903. However, non-specific information that does not indicate a need for leave necessitated by a serious health condition of the employee or employee's family member is insufficient to provide notice. *See id.* at 903 (citing cases in which summary judgment was granted to employer when employee simply called in sick); *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 472–73 (8th Cir. 2007) (holding employee's statement to employer that she had been diagnosed with depression, absent any additional details, was insufficient to constitute notice as a matter of law because not all "variations" of depression would qualify as serious); *Woods*, 409 F.3d at 992–93 (concluding doctor's notes stating employee should not work without a diagnosis or additional detail did not give sufficient notice); *cf. Wages v. Stuart Mgmt. Corp.*, 798 F.3d 675, 680 (8th Cir. 2015) (affirming determination that doctor's note referencing the need and reason for leave was adequate notice as a matter of law); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1000 (8th Cir. 2011) (concluding employer was on notice of need for FMLA leave based on inquiries made by both pregnant employee and her supervisor about employee's FMLA rights); *Phillips*, 547 F.3d at 910–11 (finding reasonable jury could conclude employee provided adequate notice in light of evidence that the employee informed her employer she was attending a doctor's

appointment related to a prior accident that could result in a need for additional time off and that employer printed FMLA paperwork for employee to complete).

As a matter of law, Malark gave RBC enough information to meet the FMLA's notice requirement.  In her June 5, 2017 email to Versnel and Thorne, Malark explained that her daughter had been admitted to an inpatient mental health unit[3] and that she would need time away from the office over the "next couple of weeks."  First Kornblit Decl., Ex. 5.  On September 6, Malark told Versnel that she would need to miss work that day because she was at the hospital with her daughter.  Second Kornblit Decl., Ex. 8.  And on September 18, in response to Hawley's e-mail, Malark called Hawley to discuss FMLA leave, disclosed that she had been missing work intermittently to care for her daughter, and explained her daughter's health issues in detail.  First Kornblit Decl., Ex. 13; Hawley Dep. at 49:7–51:16.[4]  Considered separately, each of these communications is indisputably sufficient to meet FMLA's notice requirement.  It is fairly debatable whether other of Malark's communications met or contributed to meeting the FMLA's notice requirement.

---

[3]     The Parties do not dispute that Malark's daughter suffered from a serious health condition.  A serious health condition "means an illness, injury, impairment, or physical or mental condition that involves— (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  The anxiety, depression, and suicidal behavior for which Malark's daughter received inpatient treatment meet this definition.

[4]     Malark also points to the email she received from Hawley after their phone conversation, to which Hawley attached FMLA paperwork, as evidence that RBC understood Malark to have provided adequate notice.  However, the law imposes an affirmative duty on Malark to meet the notice requirements regardless of RBC's perception.  *See Adams v. Scalzo Hosp., Inc.*, No. 13-cv-154 (ADM/SER), 2014 WL 1234496, at *7 (D. Minn. Mar. 25, 2014) (stating employer's decision to send FMLA packet "should not serve to excuse [employee] from her responsibilities to communicate with [her employer]").

For example, during a telephone call with Sorenson "during late summer of 2017," Malark communicated only that she was having "personal issues" with her daughter that required her to be in and out of the office. Sorenson Dep. at 101:5–104:6. Malark provided no details, leaving Sorenson uncertain whether Malark was missing work to care for her daughter. *Id.* at 101:5–102:8. But on this record, the possible insufficiency of some of Malark's communications does not undo or cast doubt on the legal sufficiency of other communications. In other words, the record does not justify the conclusion that Malark's less-specific communications, or some subset of them, contradict or inject vagueness into the specificity and adequacy of others. RBC argues that two facts—that Malark failed to review or complete the FMLA paperwork she received from Hawley, and that Malark told Hawley she had been making up missed time—at least create a fact dispute as to the sufficiency of Malark's notice. *See* Malark Dep. at 290:6–291:21; Hawley Dep. at 50:10–18. The argument seems to be that Malark's failure to exercise FMLA leave undermines the sufficiency of her notice. This is not correct. Giving FMLA notice and exercising FMLA leave are different issues. Regarding notice, it seems worth repeating that the law requires an employee to communicate that she *may* need leave so that an employer is aware of the *possibility* that FMLA leave could be needed. *See Phillips*, 547 F.3d at 910 (noting employee was terminated before turning in any FMLA paperwork). As a matter of law, Malark met this notice standard.[5]

To prevail on her entitlement claim, however, Malark must also show that RBC "refuse[d] to authorize leave under the FMLA or [took] other action to avoid

---

[5]      RBC does not argue that Malark failed to comply with its FMLA-notice policy.

responsibilities under the Act." *Pulczinski*, 691 F.3d at 1005.  Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Stallings*, 447 F.3d at 1050.  "An employer's action that deters an employee from participating in protected activities constitutes 'interference' or 'restraint' of the employee's exercise of [her] rights."  *Id.*  An employee must show actual deterrence. *Pulczinski*, 691 F.3d at 1007 (rejecting plaintiff's argument that he need only show that an employee of ordinary firmness would have been discouraged).

Malark did not submit the FMLA paperwork she received from Hawley, so she cannot claim that RBC took adverse action in response to a formal application for FMLA leave.  *See* Malark Dep. at 68:14–16.  Instead, Malark's entitlement claim is based on the assertion that Hawley actually deterred her from taking FMLA leave by "portray[ing] the FMLA as offering no benefit to Malark."  Pl. Mem. in Opp'n at 46–47.  As support for this assertion, Malark identifies a single telephone call she had with Hawley concerning FMLA leave.  In her deposition, Malark testified that during this call, Hawley explained the FMLA process, including specifically that Malark first would have to use her PTO and, once that was exhausted, FMLA leave would be unpaid.  Malark Dep. at 67, 70, 289.  Hawley explained that Malark could take intermittent leave—that leave "didn't have to be consecutive days."  *Id.* at 291.  According to Malark, Hawley explained that, "if [she] was ever on a conference call, in order to be counted, so to speak, as an FMLA day that [Malark] [was] required to be a hundred percent out of the office" to the point of not participating in conference calls or other office communications, and then said: "'And, Maria, when does that ever happen?  When has that ever happened?'"  *Id.* at 70–71; *see also id.* at 289.

According to Malark, Hawley's rhetorical questions concerning whether it might be realistic for Malark to be "a hundred percent" disconnected prompted Malark to conclude there would be no benefit to FMLA leave and thus unlawfully discouraged her from applying for it. *Id.* at 290–91.

No reasonable juror could find that Hawley's comments unlawfully deterred Malark from seeking FMLA benefits. That conclusion cannot reasonably be drawn from the record. Malark testified that she understood the FMLA leave process, *id.* at 66–67, that after their call Hawley sent her the FMLA paperwork, *id.* at 71, that neither Hawley nor any other RBC employee prevented her from completing the forms, *id.* at 72, and that no RBC employee ever threatened her with punishment if she applied for FMLA leave, *id.* at 72. Malark identifies nothing factually or legally incorrect about the guidance Hawley provided during their telephone call. That seems important. It's hard to understand how FMLA guidance that is factually and legally accurate—or at least that has not been shown to be factually or legally inaccurate—might give rise to an entitlement claim. Regardless, Malark acknowledged that it was "[her] choice" whether to take FMLA leave. *Id.* at 71. She understood that if she wanted to allow herself "the most time away from work," she would need to use her PTO and then take FMLA leave. *Id.* at 67. But as Malark also acknowledged, she was "an exempt employee [who] could come and go as [she] wanted." *Id.* at 86. Against these facts, Hawley's comments cannot reasonably be understood to convey that FMLA leave had no benefit or otherwise to actually deter Malark from seeking FMLA benefits. *Id.* at 289–90.

2

To establish an FMLA discrimination claim, an employee must show that her employer "discriminated against [her] in the terms and conditions of employment" and "was motivated by [her] exercise of rights under the FMLA." *Pulczinksi*, 691 F.3d at 1006. When, as here, an employee does not provide direct evidence of discrimination, an FMLA discrimination claim is evaluated "under the *McDonnell Douglas* burden-shifting framework that is applied in Title VII cases." *Id.* at 1007. To establish a prima facie case of FMLA discrimination, the employee must show that she (1) engaged in activity protected under the Act, (2) suffered a materially adverse employment action, and (3) that there is a causal connection between her action and the adverse employment action. *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 908 (8th Cir. 2015). "A causal connection exists when the plaintiff shows that a discriminatory motive played a part in the adverse employment action." *Hasenwinkel v. Mosaic*, 809 F.3d 427, 433 (8th Cir. 2015) (internal quotations omitted). The burden of showing a prima facie case is "minimal." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (quotation omitted). If the plaintiff meets this burden, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer meets this burden, then the plaintiff must demonstrate that her employer's purportedly legitimate, nondiscriminatory reason was pretextual or discriminatory in its application. *Id.* at 807.

Malark satisfies the first two elements of the *McDonnell Douglas* framework. Whether Malark engaged in protected activity is settled. She did. The Eighth Circuit, in

line with several other circuits, has held that "notifying an employer of the intent to take FMLA leave is protected activity."  *See Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1016–17 (8th Cir. 2013) (quoting *Wehrley v. Am. Fam. Mut. Ins. Co.*, 513 F. App'x 733, 742 (10th Cir. 2013) (citing cases from the Third, Sixth, and Eleventh Circuits)).  The earlier determination that, as a matter of law, Malark gave RBC enough information to meet the FMLA's notice requirement, *see supra* at 20–24, requires determining that, as a matter of law, Malark engaged in protected activity.  No doubt Malark's termination was a materially adverse employment action.  *Wages v. Stuart Mgmt. Corp.*, 798 F.3d 675, 678 (8th Cir. 2015) ("Termination is unequivocally an adverse employment action.").

Malark has not identified record evidence establishing a triable issue with respect to the third element.  "To establish a causal link between her exercise of FMLA rights and termination, Malark points to the temporal proximity between her protected activity and termination."  Pl. Mem. in Opp'n at 44.  "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."  *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citation omitted).  Temporal proximity alone may suffice only if it is "very close."  *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted).  In determining the temporal relationship between the two events, the Eighth Circuit "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended."  *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted).  Without "something more," a gap of more than two months between the date the employer knew of the employee's planned use of FMLA leave and

the adverse action "is too long" to show a causal connection between the two. *Id.* at 901 (citations omitted). Here, Malark first notified RBC that she may need FMLA leave on June 5, 2017. First Kornblit Decl., Ex. 5. Her employment was terminated October 5, 2017, or four months later. Versnel Dep. at 166:8–167:3; Malark Dep. at 300:19–25. Under Eighth Circuit precedent, this timing permits no inference of a causal connection between the two.[6]

B

Malark asserts several discrimination claims against RBC: sex and sex-plus discrimination claims under Title VII and the MHRA, a familial status discrimination claim under the MHRA, and an associational disability discrimination claim under the ADA. Compl. ¶¶ 73–109. She also asserts a reprisal claim against RBC under the MHRA based on disability association. *Id.* ¶¶ 110–14. Because Malark points to no direct evidence of discrimination or reprisal,[7] her claims must be analyzed under the *McDonnell Douglas*

---

[6]   Malark's opposition brief suggests a second causation theory. In her deposition, Malark testified that, after she "declared" her need to take time off to care for her daughter, Versnel "started to scrutinize everything that [Malark] did," refused to give "approval for things, . . . started sending emails about this is unacceptable, put[] new projects on, new demands." Pl. Mem. in Opp'n at 45 (citing Malark Dep. at 363:21–364:7). Malark seems to suggest that this testimony creates a triable issue as to whether Versnel's scrutiny, criticism, and work assignments were an adverse employment action. It does not. As a rule, the Eighth Circuit has held that "alleged mistreatment by [] supervisors, includ[ing] holding [an employee] to a higher standard than other [employees], subjecting her to a negative performance evaluation, [or] scrutinizing her work more closely" do not, "without evidence of tangible injury or harm," "rise[] to the level of a materially adverse employment action." *Hasenwinkel*, 809 F.3d at 434 (internal quotation omitted). Malark's deposition testimony does not differentiate her claim from this general rule.

[7]   Direct evidence of discrimination entails "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse

29

burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1044 (8th Cir. 2005) (applying

*McDonnell Douglas* framework to ADA claims); *Hoover v. Norwest Private Mortg.*

*Banking*, 632 N.W.2d 534, 542, 548 (Minn. 2001) (applying *McDonnell Douglas*

framework to both discrimination and reprisal claims under the MHRA).  To establish a

prima facie case of discrimination, a plaintiff must show that: (1) she is a member of a

protected group; (2) she was qualified to perform her job; (3) she suffered an adverse

employment action; and (4) the circumstances give rise to an inference of

discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Kennedy v. Heritage of Edina, Inc.*,

No. 13-cv-71 (DSD/JJG), 2014 WL 3828167, at *5 (D. Minn. Aug. 4, 2014) (stating

plaintiff must show that her employer knew that she had a relative or associate with a

disability to establish a prima facie case for an ADA associational disability claim).

Similarly, to establish a prima facie case for a reprisal claim under the MHRA, a plaintiff

must show "(1) statutorily-protected conduct by the employee; (2) adverse employment

action by the employer; and (3) a causal connection between the two."  *Hubbard v. United*

*Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983).  If the plaintiff establishes a prima

facie case, the defendant bears the "non-onerous" burden of production to offer a

legitimate, non-discriminatory (or non-retaliatory, in the case of a reprisal claim) reason

---

employment action."  *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005)
(quotation omitted).  It includes "comments or statements indicating discriminatory intent,
where those comments are made by people with decision-making authority."  *Hutton v.
Maynard*, 812 F.3d 679, 683 (8th Cir. 2016).  Whether evidence of discrimination is direct
or indirect depends on "the causal strength of the proof, not whether it is 'circumstantial'
evidence."  *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (quotation omitted).

for her termination. *Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 857–58 (8th Cir. 2008) (quotation and citations omitted). If the defendant does so, the burden of proof then shifts back to the plaintiff to show that the defendant's reason for the employment action was a pretext for intentional discrimination (or reprisal). *Id.* at 858. At all times, the burden of proving that the employer's conduct was because of unlawful intent remains with the plaintiff.[8] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011).

It is undisputed that Malark can satisfy the first three elements of the prima facie case for her discrimination claims and the first two elements of the prima facie case for her reprisal claim. Def. Mem. in Supp. at 21; Pl. Mem. in Opp'n at 30–31. RBC argues that it is entitled to summary judgment because Malark cannot establish the final element of her prima facie case for any of her claims nor carry her ultimate burden of showing that

---

[8]     Under Title VII, "an unlawful employment practice is established" when a plaintiff demonstrates that his or her membership in a protected group "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). The Eighth Circuit has applied the same "motivating factor" standard to ADA discrimination claims. *See Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 991 (8th Cir. 2007). However, in *Gross v. FBL Fin. Servs., Inc.*, the United States Supreme Court declined to apply the burden-shifting framework to claims brought under the Age Discrimination in Employment Act ("ADEA") and interpreted "because of" in the ADEA to require a plaintiff "to establish that age was the 'but-for' cause of the employer's adverse action." 557 U.S. 167, 173–78 (2009). The Eighth Circuit subsequently questioned whether the "motivating-factor" standard continues to apply to ADA discrimination claims in light of *Gross* or whether the use of "because of" in the ADA also implicates the more rigorous "but-for" standard. *Pulczinksi*, 691 F.3d at 1002. But the Eighth Circuit has since applied a mixed-motive standard to an ADA discrimination claim in the same decision in which it applied a "but-for" standard to an ADA retaliation claim. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755–59 (8th Cir. 2016). Likewise, Minnesota courts have not yet addressed whether the "but-for" causation standard that applies to Title VII retaliation claims also applies to reprisal claims under the MHRA. *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 819 (8th Cir. 2017).

RBC's stated reason for her termination was a pretext for unlawful action.  Def. Mem. in Supp. at 20–26.

1

Title VII and the MHRA prohibit employers from "discharg[ing] any individual" or otherwise "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.08, subd. 2.  A plaintiff can establish an inference of sex discrimination "in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class" or "by showing biased comments by a decisionmaker."  *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 774 (8th Cir. 2016) (quoting *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011)); *see Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (stating comparative evidence is not the "exclusive means by which a plaintiff may establish an inference of discrimination").  Though "evidence of pretext is normally considered at the last step of the *McDonnell Douglas* analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case."  *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014).  "At the inference-of-discrimination stage, "[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Id.*

A reasonable jury could find that Malark suffered discrimination on the basis of sex. Malark advances three arguments to support her position on this issue.  She first asserts

32

that Versnel treated her differently from similarly situated male directors.[9]  Second, Malark

asserts that Versnel exhibited a pattern of treating female direct reports poorly as compared

with male direct reports.[10]  Third, Malark asserts that she was replaced by a less qualified

male employee.  If Malark's first two assertions were insufficient to raise a triable issue of

discrimination—questions not decided here—her third contention does the job.  Proof that

a plaintiff was replaced by an individual outside the protected class is not required to make

a prime facie case of discrimination, but it is sufficient to satisfy the *McDonnell Douglas*

---

[9]      "To create an inference of discrimination based upon disparate treatment, the
plaintiff must show she was treated differently than similarly situated persons who are not
members of the protected class."  *Faulkner v. Douglas Cty., Neb.*, 906 F.3d 728, 732 (8th
Cir. 2018) (citing *Bennett v. Nucor Corp.*, 656 F.3d 802, 819 (8th Cir. 2011)).  Comparators
must be similarly situated in all relevant aspects, meaning that "the individuals used for
comparison must have dealt with the same supervisor, have been subject to the same
standards, and engaged in the same conduct without any mitigating or distinguishing
circumstances."  *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011)
(quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004)).

[10]     "A plaintiff may indeed rely upon discriminatory conduct toward others in an
attempt to show [s]he was the victim of discrimination h[er]self" so long as the plaintiff
shows that "the circumstances are substantially similar to the other alleged victims of
discrimination."  *Nemec v. Wal-Mart Assocs., Inc.*, No. 14-cv-4450 (RHK/LIB), 2015 WL
8492040, at *7 (D. Minn. Dec. 10, 2015) (citing *Quigley v. Winter*, 598 F.3d 938, 951 (8th
Cir. 2010)); *see also Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001)
("Evidence of a discriminatory attitude in the workplace, though it may not rise to the level
of direct evidence, may also tend to show that the employer's proffered explanation for the
action was not the true reason for the discharge.").  But instances of possible discrimination
cannot simply be aggregated to establish probable discrimination.  *Heisler v. Nationwide
Mut. Ins. Co.*, 931 F.3d 786, 797 (8th Cir. 2019).  The number of female-versus-male
employees "alone is insufficient to show discriminatory animus."  *Wittenburg v. American
Exp. Fin. Advisors, Inc.*, 464 F.3d 831, 841 (8th Cir. 2006).  "Factors to be considered
include whether the other alleged discriminatory behavior is close in time to the events at
issue in the plaintiff's case; whether the same decisionmakers were involved; whether the
other employee and the plaintiff were treated in a similar manner; and whether the
employee and the plaintiff were otherwise similarly situated."  *Nemec*, 2015 WL 8492040,
at *7.

test's fourth element. *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994). Here, Malark was replaced by Schwab, and Malark has identified record evidence that raises a genuine fact issue as to whether Schwab was less qualified for the position than Malark. Versnel acknowledged that Schwab "did not have an extensive operations background," but was selected "based on his strong leadership history with RBC." Versnel Decl. ¶ 20; *see* Versnel Dep. at 41:11–16; Second Kornblit Decl., Ex. 48 (email from Schwab stating "[w]hile I don't know anything about Ops(lol) I know how to engage team members."). After he started in Malark's former position, RBC required Schwab to pass a licensing exam necessary to enable him to supervise certain transactions; in his deposition, Schwab conceded that passing the examination was important to his performance in the role. Schwab Dep. at 11:21–14:6; *see* Malark Decl. ¶ 6 (stating she had held such a license). At the time of his deposition, Schwab had failed the examination twice, though he had recently attempted the examination a third time, and he did not know whether his performance on the examination might impact his RBC employment. *Id.*

The Parties do not dispute that RBC has proffered a facially legitimate, non-discriminatory reason for Malark's termination—that she did not satisfy the criteria of RBC's new leadership model. To defeat RBC's summary-judgment motion, Malark "must present sufficient evidence that [RBC] acted with an intent to discriminate, not merely that the reason stated by [RBC] was incorrect." *Pulczinski*, 691 F.3d at 1003. "A plaintiff generally may show that a proffered justification is pretextual in two ways," *Fiero v CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014):

> First, a plaintiff may rebut the factual basis underlying the employer's proffered explanation, thereby demonstrating that

> the explanation is unworthy of credence.  Second, a plaintiff
> may show that the employer's proffered explanation was not
> the true reason for the action, but rather that the impermissible
> motive more likely motivated the employer's action.  In either
> case, the plaintiff must point to enough admissible evidence to
> raise genuine doubt as to the legitimacy of the defendant's
> motive.

*Id.* (internal quotations and citations omitted).  A plaintiff must show more substantial evidence to prove pretext than is required to make a prima facie case "because evidence of pretext is viewed in light of [the employer's] proffered justification."  *Id.*  "[A] genuine issue of fact regarding unlawful employment discrimination may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action."  *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017–18 (8th Cir. 2005).

Malark has identified record evidence from which a reasonable jury could conclude that RBC's proffered reason for her termination was pretextual.  RBC and Versnel's contemporaneous documentation of Malark's performance is sufficiently inconsistent with the RBC's stated reason for her termination.  It is true that Malark was the subject of complaints from employees who reported to her and her colleagues about aspects of her behavior as a manager and that she received coaching to remedy the areas of complaint.  But the record also reflects that Malark consistently received positive performance reviews from Versnel.  *See Strate*, 398 F.3d at 1020 ("[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination.  However, such circumstantial evidence can be relevant when considering whether the record as a whole establishes a genuine issue of material fact.").  The record also shows that Versnel

increased Malark's responsibilities and the number of employees under her supervision, and that Malark made "significant" gains on employee opinion surveys in 2015 and 2017, ranking in the second quartile of managers at RBC. Versnel also commended Malark specifically for living up to the new leadership model only months before her termination. Versnel's differing characterizations of this evidence during her deposition highlight the existence of genuine factual disputes material to the credence of RBC's proffered reason for Malark's termination. The record also contains materially conflicting evidence regarding the timing of RBC's decision to terminate Malark. The timeline for RBC's cultural transformation initiative provided that changes in employment status would be communicated to affected employees in mid-June 2017, but Malark was not notified of her termination until October 2017. Though Versnel testified that Malark was considered for other positions in the organization before she made the termination decision, Sorenson testified that she did not believe this occurred. Versnel's testimony about the circumstances and timing of the decision is not clearly supported by her contemporaneous notes or the testimony of other RBC representatives. Nor is it internally consistent. And Versnel conceded in her deposition that there was not, to her knowledge, any documentation of her assessment of Malark against RBC's new leadership model. Summary judgment on this record is not appropriate.

2

Title VII and the MHRA also are understood to prohibit "sex-plus" discrimination against employees. Sex-plus discrimination occurs when an employer takes adverse action against an employee because of both the employee's sex and another immutable

characteristic, though neither statute prohibits discrimination based on the additional characteristic alone. *See Phillips v. Martin Marietta Corp.¸* 400 U.S. 542, 544 (1971) (per curiam); *Knott v. Missouri Pac. R.R. Co.*, 527 F.2d 1249, 1250 (8th Cir. 1975) ("'Sex-plus' discrimination occurs when employees are classified on the basis of sex plus one other seemingly neutral characteristic."); *Pullar v. Indep. Sch. Dist. No. 701*, 582 N.W.2d 273, 276–77 (Minn. Ct. App. 1998) (recognizing a sex-plus-familial-status claim under the MHRA prior to the addition of familial status as a protected status); *see also* 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.08, subd. 2. "Interpreting § 2000e-2 to proscribe this type of discrimination . . . means that similarly situated individuals of one sex cannot be discriminated against vis-à-vis members of their own sex unless the same distinction is made among those of the opposite sex." *Knott*, 527 F.2d at 1251; *see Johnston v. U.S. Bank Nat'l Ass'n*, 08-cv-296 (PJS/RLE), 2009 WL 2900352, at *8 (D. Minn. Sept. 2, 2009) ("Sex-plus discrimination must, however, be discrimination *based on sex*."). For example, "an employer commits sex-plus discrimination if it treats men with children better than women with children—and this is true even if the employer does not treat women *without* children any worse than men without children (or, for that matter, any worse than men with children)." *Johnston*, 2009 WL 2900352, at *8 (considering a sex-plus-parental-status claim under the MHRA); *see also King v. Trans World Airlines, Inc.*, 738 F.2d 255, 259 (8th Cir. 1984) ("[A]n employer cannot have two interview policies for job applicants with poor work records, poor attendance records, small children or some other characteristic—one for men and one for women."). "But an employer who treats *everyone* with children poorly does not commit sex-plus discrimination" because the

employer "is not treating women worse than men," only "men and women with children worse than men and women without children." *Johnston*, 2009 WL 2900352, at *8. Though courts historically have required sex-plus plaintiffs "to show unfavorable treatment as compared to a matching subcategory of the opposite sex," *see Shazor v. Prof'l Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014), the United States Supreme Court recently held in *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020), that the employment discrimination inquiry is an individual one:

> An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision. And it doesn't matter if the employer treated women as a group the same when compared to men as a group. If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.

The Tenth Circuit Court of Appeals, the only circuit court to address sex-plus discrimination post-*Bostock*, has held that "a female sex-plus plaintiff must show that her employer treated her unfavorably relative to a male employee who also shares the 'plus-' characteristic," but "does not need to show discrimination against a subclass of men[.]" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1047 (10th Cir. 2020). "[S]ex-plus plaintiffs must still specify the 'plus-' characteristic on which they premise their claims" to allow a court "to assess whether an employer discriminated against a sex-plus plaintiff relative to an employee of the opposite sex who shares the 'plus-' characteristic. *Id.* at 1050.

Malark's sex-plus discrimination claims are based on her status as a woman with children.[11]  Malark has not, however, identified record evidence establishing a trial-worthy issue with respect to causality.  Malark says the fact that Versnel chose to terminate her while she was at a hospital with her daughter permits an inference of sex-plus discrimination.  It does not.  Without something more, it's hard to understand how poor (even cruel) timing permits an inference of discrimination.  If that were enough, every parent or care provider who suffered an adverse employment action while serving in that role would have a claim.  Malark points out that Schwab is a father, but the only record evidence Malark cites to establish this fact is her declaration.  *See* Malark Decl. ¶ 16. Malark identifies no record evidence showing that the individuals who chose Schwab as Malark's replacement knew that fact.  Finally, Malark cites to her deposition testimony that, after learning of Malark's need to care for her daughter, Versnel increased Malark's responsibilities and more closely scrutinized Malark's work.  *See* Malark Dep. at 363:21–364:7.  This evidence does not permit an inference of sex-plus discrimination.  As discussed, the assignment of additional responsibilities and added scrutiny are not a materially adverse employment action.  *See supra* at 29 n.6.  If it did, Malark identifies no evidence permitting the inference that Versnel treated her male employees with children, or other employees without children, differently.

---

[11]     Malark's discrimination claim based on familial status under the MHRA is premised on the same facts and, therefore, will be considered together with her sex-plus discrimination claims.  *See* Minn. Stat. § 363A.08, subd. 2 (prohibiting employers form discharging an employee because of "familial status").

3

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees[.]"  42 U.S.C. § 12112(a).  Discrimination "against a qualified individual on the basis of disability includes . . . excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  Similarly, the MHRA prohibits an employer from "intentionally engag[ing] in any reprisal against any person because that person . . . associated with a person or group of persons who are disabled[.]"  Minn. Stat. § 363A.15, subd. 2.

To establish the final element of her prima facie case for her ADA and MHRA reprisal claims, Malark relies on the temporal proximity between when she disclosed her daughter's health condition to Versnel and when she was terminated.  Pl. Mem. in Opp'n at 35–36.  A temporal connection can show a causal link between an adverse employment action and the employee's association with a disabled person, but temporal proximity alone is generally not enough to make a prima facie case under the ADA unless it is "very close." *See E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832–33 (8th Cir. 2002) (concluding two weeks between disclosure of potentially disabling condition and termination was "sufficient, but barely so, to establish causation" for plaintiff's prima facie ADA case).  Likewise, the third element of the prima facie case for an MHRA reprisal claim may be proven "by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the

40

employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." *Liles*, 851 F.3d at 819 (quoting *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995)); *see, e.g.*, *Hubbard*, 330 N.W.2d at 445 (concluding plaintiff's termination two days after service of complaint was sufficient to make prima facie case). Here, as noted, Malark's superiors first learned of her daughter's disability on June 5, 2017, four months before her termination. *See* First Kornblit Decl., Ex. 5. That is too great a gap to permit a reasonable inference of discrimination.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Plaintiff Maria Malark's motion for partial summary judgment [ECF No. 121] is **GRANTED**;

2. Defendant RBC Wealth Management's motion for summary judgment [ECF No. 161] is **GRANTED** with respect to Plaintiff's entitlement and discrimination claims under the FMLA (Counts I and II), sex-plus discrimination claims under Title VII and the MHRA (Counts IV, VII), familial status discrimination claim under the MHRA (Count VIII), associational disability discrimination claim under the ADA (Count V), and reprisal claim under the MHRA (Count IX); and

3.      Defendant RBC Wealth Management's motion for summary judgment [ECF No. 161] is **DENIED** with respect to Plaintiff's sex discrimination claims under Title VII and the MHRA (Counts III and VI).


Dated:  August 28, 2020                         s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court